# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALLEN GENE RIECHMAN,                    Case No. 1:20-cv-494
      Plaintiff,                            Litkovitz, M.J.

      vs.

COMMISSIONER OF                          **ORDER**
SOCIAL SECURITY,
      Defendant.

Plaintiff Allen Gene Riechman brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI").[1]  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 14), the Commissioner's response in opposition (Doc. 19), and plaintiff's reply

memorandum (Doc. 22).

## I. Procedural Background

Plaintiff protectively filed his applications for DIB and SSI in January 2017, alleging

disability since April 28, 2016, due to seronegative arthritis, pain in his joints, neck pain,

hypertension, depression, and chronic obstructive bronchitis.  The applications were denied

initially and upon reconsideration.  Plaintiff, through counsel, requested and was granted a *de*

*novo* hearing before administrative law judge ("ALJ") Thuy-Anh T Nguyen.  Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing on March 7, 2019.  On June

3, 2019, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  This decision

---

[1] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical . . . and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively."  *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n.1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)).  The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations for purposes of this Report and Recommendation.

became the final decision of the Commissioner when the Appeals Council denied review on April 28, 2020.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The [plaintiff] has not engaged in substantial gainful activity since April 28, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: seronegative arthritis, sacroiliitis, osteoarthritis, disorders of the spine, hypertension, and chronic obstructive pulmonary disease (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can only stand or walk four hours in an eight hour work day and sit for up to six hours in an eight hour work day; he can only occasionally operate hand controls with the bilateral upper extremities; only occasionally reach overhead with the bilateral upper extremities; he can frequently handle and finger with the bilateral upper extremities; he can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; no walking on uneven terrain; he can only occasionally balance, kneel, stoop, crouch and crawl; he must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; he must avoid all exposure to dangerous hazards such as unprotected heights and dangerous machinery; and he can only occasionally operate foot pedals with the bilateral lower extremities.

3

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] was born [in] . . . 1972 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from April 28, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-23).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[2] Plaintiff's past relevant work included the light, unskilled positions of short order cook and cleaner.  (Tr. 22, 58-59).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as router (20,000 jobs in the national economy); marker (250,000 jobs in the national economy); and label coder (15,000 jobs in the national economy).  (Tr. 23, 59-60).

4

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Plaintiff's medical history during the alleged disability period

On April 28, 2016, the alleged disability onset date, plaintiff went to the emergency department for inflammatory pain in his left hip. (Tr. 338, 344). Plaintiff reported that the "problem" occurred "occasionally" but had been "gradually worsening" the past two weeks. (Tr. 338). On examination, plaintiff was oriented to person, place, and time, appeared well-developed and well-nourished, and had normal mood, affect, behavior, and content. (Tr. 340). Plaintiff exhibited musculoskeletal tenderness but no edema or deformity; he had decreased range of motion and tenderness in his right hip but no bony tenderness, swelling, crepitus, deformity, or laceration. (*Id.*). Imaging performed on plaintiff's right hip revealed mild hip arthropathy and left sacroiliac arthropathy. (Tr. 342). Plaintiff reported "feeling much better"

5

after receiving anti-inflammatory medication. (Tr. 341). Plaintiff was discharged from the emergency department the same day. (Tr. 343-44).

Plaintiff began treating with rheumatologist Dr. Gregory DeLorenzo on May 23, 2016. (Tr. 430). Plaintiff reported that he had acute pain and swelling in his hands, feet, and ankles for three to five days before it resolved. (*Id.*). Plaintiff also reported that he had pain more recently in his hip and neck and smoked one pack of cigarettes per day. (Tr. 430-31). On examination, plaintiff's lungs were clear to auscultation; he had a regular heart rate and rhythm without murmurs; he had a loss of several degrees of full extension in his elbows but no synovitis of his elbows, wrist, MCP's, PIP's, or DIP's; and he had no synovitis of his knees or ankles but had some tenderness over his left SI area. (*Id.*). Dr. DeLorenzo reported that plaintiff had sacroiliac arthritis and possible psoriasis and plaintiff's peripheral joint symptoms were suggestive of crystal-induced gout. (Tr. 432). Imaging of plaintiff's bilateral feet on May 23, 2016 revealed unremarkable findings with no evidence of fracture or lytic lesion and only mild joint space narrowing. (Tr. 445-46). Imaging of plaintiff's bilateral hands on May 23, 2016 revealed mild symmetric osteoarthritis of the lateral wrist joints but no fracture, dislocation, periostitis, erosion, or other bone abnormality. (Tr. 449).

On the September 9, 2016 follow-up appointment with Dr. DeLorenzo, plaintiff reported that he had a marked reduction of his joint swelling in his hands and feet. (Tr. 425). Plaintiff also reported that he had stiffness and discomfort in his upper cervical spine. (*Id.*). On musculoskeletal examination, Dr. DeLorenzo noted that plaintiff had full range of motion of his shoulders and elbows; he had some stiffness of the Metacarpophalangeal joints ("MCP") and Proximal Interphalangeal joints ("PIP") but markedly reduced synovitis; he had no synovitis in his knees or ankles; and he was only minimally tender in his feet with markedly reduced swelling

of his feet. (Tr. 426). Dr. DeLorenzo stated that plaintiff showed "some definite improvement." (*Id*.). On November 8, 2016, plaintiff had a follow-up appointment with Dr. DeLorenzo in which plaintiff reported discomfort in his hands and increased symptoms after engaging in activity. (Tr. 423). Plaintiff reported that he had "been able to work to make some money to support his family." (*Id*.). On musculoskeletal examination, Dr. DeLorenzo reported that plaintiff had full range of motion in his shoulders and elbows with some stiffness and tenderness in the wrist MCP joints and PIP joints bilaterally with trace synovitis; and he had some stiffness to his knees and ankles and tenderness over the metatarsophalangeal ("MTP") joints. (Tr. 424). Dr. DeLorenzo encouraged plaintiff to completely stop smoking. (*Id*.).

On December 8, 2016, plaintiff presented to the emergency department with high blood pressure. (Tr. 352). Plaintiff indicated that he did "not have a primary care physician." Plaintiff denied having any chest pain or shortness of breath. (*Id*.). On examination, plaintiff was well-developed, well-nourished, and in no acute distress; his breath sounds were clear bilaterally; he had a regular heart rate and rhythm without murmur; he had no edema, tenderness or musculoskeletal deformities; and he was alert and oriented times three with no focal deficits. (Tr. 354). Plaintiff was diagnosed with "mild hypertension" and was given medication to treat his condition. (Tr. 355). Plaintiff was discharged the same day. (*Id*.).

On December 29, 2016, plaintiff established care with Dr. Zachary Thurman. (Tr. 366). Plaintiff reported leg and wrist pain. (*Id*.). Plaintiff also reported that the pain in his hands had "gotten worse," but his ambulatory ability had "improved" since he started taking medication to treat his conditions. (*Id*.). On examination, Dr. Thurman reported that plaintiff was well-appearing, in no acute distress, had no obvious joint effusion or muscle wasting, and rose from the seated position easily. (Tr. 367). Dr. Thurman stated that plaintiff's function associated with

7

his seronegative arthritis had worsened since he started treating with Methotrexate and prednisone. (*Id*.). He referred plaintiff to UC rheumatology for a second opinion. (*Id*.). On follow-up with Dr. Thurman on January 20, 2017, plaintiff reported pain all over his body and a sensation of swallowing his tongue. (Tr. 377). Plaintiff specifically reported that shaking his hands, stepping down awkwardly, or throwing a ball all cause ongoing pain. (*Id*.). Plaintiff desired to stop all of his medications because he did not think they were helping. (*Id*.).

On January 26, 2017, plaintiff presented to Dr. Thurman for a follow-up on his blood pressure. (Tr. 386). Plaintiff reported that he was feeling okay, but his pain was worse that morning. (*Id*.). Plaintiff also reported that he had been smoking and using marijuana. (*Id*.). Plaintiff saw Dr. DeLorenzo on February 10, 2017 and reported that he still had some discomfort in his hands and feet, but overall, he was markedly improved. (Tr. 421). Dr. DeLorenzo noted that plaintiff would have marked increased symptoms if he engaged in any physical activity. (*Id*.). Plaintiff reduced his smoking to about half a pack a day and his laboratory studies were stable. (*Id*.). On musculoskeletal examination, Dr. DeLorenzo reported that plaintiff had some trace synovitis in his wrist MCPs and PIPs but no synovitis in his knees or ankles. He also had a rheumatoid nodule over the left olecranon area. (*Id*.). Plaintiff was encouraged to stop smoking and to follow up in three months for reassessment. (Tr. 422).

On February 20, 2017, plaintiff established care with Dr. Rina Mina. (Tr. 559). Plaintiff reported he was having difficulty and problems moving his neck and hands. (*Id*.). Plaintiff stated that he worked on a farm and had stiffness in the morning in his hands, feet, and neck. (*Id*.).[4] On examination, Dr. Mina reported that plaintiff was oriented to person, place, and time

---

[4] Several treatment notes throughout plaintiff's alleged disability period state that plaintiff is, or was, working on a farm. (*See generally* Tr. 559). Plaintiff's "Social History Narrative" states, in pertinent part, that plaintiff "*[l]ives in Western Hills, has a farm in Milan, IN – has a friend that helps with farming*[.]" (*Id*.) (emphasis in original). There is, however, no information in the record as to the frequency or consistency of the work or what exactly the work

and appeared well-developed and well-nourished; had normal breath sounds with no stridor, respiratory distress, wheezes, or rales; had decreased range of motion in his spine and recorded 5/5 on the Modified Schober Test ("MST"), but he had no tender points or synovitis. (Tr. 561). Dr. Mina ordered an MRI for plaintiff's cervical spine (Tr. 563), which revealed mild degenerative disc disease at C6-C7 associated with compression of the thecal sac and moderate C7 neuroforaminal narrowing bilaterally. (Tr. 458). On follow-up appointment with Dr. Mina on March 20, 2017, plaintiff reported difficulty moving his neck and problems moving his hands, swelling when he used his hands, and stiffness in the morning in his hands, feet, and neck. (Tr. 567). On examination, Dr. Mina reported that plaintiff was oriented to person, place, and time and appeared well-developed, well-nourished, and in no distress; had normal breath sounds with no stridor, respiratory distress, wheezes, or rales; had decreased range of motion in his spine and multiple tender points; no synovitis; and recorded 5/5 on the MST. (Tr. 569).

On a follow-up evaluation of arthropathy with Dr. Greg Mott on June 1, 2017, plaintiff reported that he had fallen about five times in the last three months. (Tr. 573). Dr. Mott believed that the falls were "mechanical." (*Id.*; *see also* Tr. 578). Plaintiff reported that his "main problems" were in the joints of his right hand and right foot. Plaintiff explained that he had trouble doing anything with his right hand and instead does everything with his left hand. (*Id.*). Plaintiff also reported new muscle pain in his left bicep/tricep area. (*Id.*). On examination, Dr. Mott noted that plaintiff was a "[d]epressed appearing gentleman in no acute distress, though complain[ed] of much pain." (Tr. 576). Dr. Mott reported that plaintiff had tenderness at multiple joints, mostly PIPs, but also bilateral wrists; tenderness to palpation of biceps/triceps of right arm; multiple tender trigger points; no active synovitis; weak hand grip

---

entails. The only information the Court has as to plaintiff's duties on the farm is that he "pick[ed] up buckets to feed animals[.]" (Tr. 492).

bilaterally; weakness of bilateral lower extremities throughout all muscle groups but mostly pronounced in plaintiff's knees and ankles; and positive hand and foot squeeze sign bilaterally. (*Id*.). Dr. Mott reported that plaintiff's weakness of bilateral lower extremities throughout all of his muscle groups was "strongly effort dependent." (*Id*.; *see also* Tr. 578). Plaintiff was able to force his arms to do a decent touchdown sign; had full range of motion in his elbows and wrists with no synovitis or deformity; had mild swelling in his left wrist and tenderness in both; was able to extend the fingers of his right hand with effort; and had full range of motion in his hips, knees, ankles, and MTP joints. (Tr. 576-77). Dr. Mott opined that "[o]verall, I think that this disease is controlled, and most of his pain and stiffness is originating from his fibromyalgia." (Tr. 577). Dr. Mott again noted that weakness in plaintiff's bilateral upper extremities was "highly effort dependent." (Tr. 578).

Plaintiff participated in physical therapy on June 12, 2017. (Tr. 492). On initial evaluation, plaintiff indicated that his pain was more frequent and that he needed to sleep, for example, if he "pick[ed] up buckets to feed animals[.]" (*Id*.). Plaintiff reported that he was falling more and experienced pain when walking and holding objects. (Tr. 493). The physical therapist stated that plaintiff would benefit from skilled physical therapy to address his deficits. (Tr. 494). It was recommended that plaintiff receive skilled physical therapy services up to two times per week for up to eight weeks or up to sixteen visits. (Tr. 495). Plaintiff went to a second physical therapy session on June 19, 2017, "but did not want to participate due to pain and fear of more pain with therapy." (Tr. 506). The physical therapist explained:

> He [plaintiff] asked me to walk him out where we discussed gentle ROM and using heat to relax him. Educated him about abdominal breathing to decrease his anxiety which led to him coughing. He coughed with severe pain. He said he just wants his pain to end. He appeared very desperate for relief of pain. I encouraged him to continue to call his Md and not be afraid of the pain clinic.

10

> [Plaintiff] was in tears.  Educated on purpose of PT and on gentle ROM which he
> would have control of movements and thus his pain.  He refused to sit or lie down
> because he did not think he could get up from these positions.  When he told me he
> had to drive home I reminded him that he would be sitting in the car and he was
> able to get up already.  He continued to complain of pain.  I asked if I could call
> someone to take him home and he refused.  Reminded [plaintiff] I would message
> the md's but he needed to call on his end to let them know how he was doing.

(*Id*.).  The record demonstrates that plaintiff did not follow-up with physical therapy following this June 19, 2017 encounter.

Plaintiff presented to Dr. Mina on June 26, 2017 with morning stiffness, swelling of his wrist and finger joints, and longstanding back pain.  (Tr. 585).  On examination, Dr. Mina reported that plaintiff was oriented to person, place, and time and appeared well-developed, well-nourished, and in no distress; he had a normal range of motion in his neck; his breathing sounded normal with no respiratory distress, stridor, wheezes, tenderness, or rales; his behavior, judgment, and thought content were all normal, and he had no suicidal or homicidal ideation; and he had "wrist 2nd and 3rd PIP and MCP right worse than left, decr[eased] ROM LS spine."  (Tr. 588).  Dr. Mina recommended that plaintiff return in one week.  (Tr. 591-92).  She also referred plaintiff for a functional capacity evaluation ("FCE").  (Tr. 592).  On July 7, 2017, Dr. Mina reported that plaintiff was "[d]oing well on prednisone burst, able to sit and move back and joints with less pain and swelling."  (Tr. 595).  Dr. Mina reported that plaintiff's range of motion had "improved from last visit."  (Tr. 597).  Dr. Mina's examination on this date was unremarkable in all other respects.  (*Id*.).  On a follow-up visit on August 14, 2017, Dr. Mina reported that plaintiff's morning stiffness and pain had "immensely improved."  (Tr. 804).  Dr. Mina noted that an MRI of plaintiff's SI showed sacroiliitis.  (*Id*.).  Dr. Mina's examination of plaintiff was identical to her July 7, 2017 examination.  (*See* Tr. 597, 806).

11

Plaintiff was hospitalized from September 9, 2017 through September 12, 2017 due to pneumonia and COPD exacerbation.  (Tr. 954-1025).  Musculoskeletal examinations of plaintiff during his hospitalization revealed that plaintiff had a "normal range of motion [with] no edema" (Tr. 957) and "no clubbing, cyanosis or edema bilaterally [and] [f]ull range of motion without deformity."  (Tr. 965, 977, 981).  Plaintiff was discharged from the hospital on September 12, 2017 in stable condition.  (Tr. 964-66).

On plaintiff's follow-up with appointment with Dr. Mina on October 2, 2017, Dr. Mina reported that plaintiff's morning stiffness and pain had "immensely improved," and plaintiff was "[d]oing better since starting treatment.  Minimal joint swelling and stiffness."  (Tr. 935).  Dr. Mina noted that plaintiff still had back and anon-articular pain.  (*Id*.).  Dr. Mina's examination of plaintiff was identical to her two prior examinations.  (*See* Tr. 597, 806, 936-37).

Plaintiff was hospitalized a second time from October 9, 2017 through October 12, 2017 due to COPD exacerbation.  (Tr. 1026-1101).  Imaging of plaintiff's chest revealed no acute or focal bony abnormality.  Imaging also showed plaintiff had a normal heart size and mediastinal contours with clear lungs.  (Tr. 1038).  On musculoskeletal examinations during his hospitalization, plaintiff exhibited a "[n]ormal range of motion [with] no edema or tenderness" (Tr. 1030); "[n]o clubbing, cyanosis, or edema bilaterally [and] [f]ull range of motion without deformity and normal gait intact" (Tr. 1044); and "[n]o cyanosis[,] [n]o clubbing[, and] [n]o joint deformity."  (Tr. 1050; *see also* Tr. 1061-62).  Plaintiff was "[f]eeling a lot better" with "[n]early resolved chest pain [and] shortness of breath" on discharge.  (Tr. 1062).

On November 22, 2017, plaintiff presented to Dr. Mina complaining of swelling of wrist and finger joints despite adherence to his medication.  (Tr. 1210).  On examination, plaintiff was oriented to person, place, and time and appeared well-developed, well-nourished, and in no

12

distress; he had normal, behavior, judgment, and thought content with no suicidal or homicidal ideations; and he had decreased range of motion in his LS spine and "wrist 2nd and 3rd PIP and MCP right worse than left."  (Tr. 1212-13).

During a physical examination on November 27, 2017, Dr. Karen Krone reported that plaintiff exhibited decreased range of motion and tenderness in his cervical and thoracic back and decreased range of motion in his lumbar back.  Plaintiff was positive for bilateral SI joint tenderness, faber, thigh thrust, and compression.  (Tr. 1246).  Dr. Krone reported plaintiff's strength at four out of five in neck flexion and extension, deltoids, biceps, triceps, wrist flexion, interossei, abdominals, iliopsoas, quadriceps, hamstrings, glutei, tibials, peroneals, and gastrocs. (Tr. 1247-48).  On sensory exam, Dr. Krone found plaintiff's bilateral arms and legs normal to touch.  (Tr. 1248).

On January 8, 2018, plaintiff was seen by physical therapist Sean Smith for the completion of an FCE.  (Tr. 1104-09).  Mr. Smith opined in the FCE that plaintiff was "unlikely to sustain part time or full time employment.  Even in a sedentary position, it is unlikely that he could attain or sustain a work pace of activity."  (Tr. 1104).  Mr. Smith opined that plaintiff's physical limitations included decreased standing balance that would impact safety when walking, lifting, squatting, crouching, or kneeling; chronic multi joint pain that would impact plaintiff's ability to perform sustained activity; decreased fine manipulation and grip strength; and decreased bilateral shoulder range of motion that would impact plaintiff's ability to reach overhead or sustain work away from his body.  (*Id*.).  Mr. Smith stated that plaintiff may also have psychosocial issues such as anxiety and depression that could impact his employability. (Tr. 1105).

13

On February 23, 2018, plaintiff had a follow-up appointment with Dr. Mina where he reported a flare-up of shoulder pain but that he was doing well on biologics and Methotrexate. (Tr. 1308). On musculoskeletal examination, Dr. Mina reported that plaintiff's "wrist 2nd and 3rd PIP and MCP synovitis" had improved, but he had decreased range of motion in his LS spine and shoulder. (Tr. 1310). On April 19, 2018, plaintiff reported he was "[d]oing well [and] [felt] best for a while"; had stopped taking Enbrel due to constipation; had pain in his feet when hiking or walking on uneven surfaces like crossing railroad tracks; and had no medication side effects but some weight gain. (Tr. 1380). Plaintiff also reported that he "did not like following up with pain clinic." (*Id*.). On musculoskeletal examination, Dr. Mina reported that plaintiff's "wrist 2nd and 3rd PIP and MCP synovitis" had improved and the "decreased ROM LS spine all improved from last visit." (Tr. 1382). Dr. Mina reported that plaintiff had decreased range of motion in his shoulder and "guarding" was present. (Tr. 1383).

On April 17, 2018, plaintiff presented for an annual physical examination with Dr. Thurman. (Tr. 1400). Plaintiff reported that his breathing was getting worse, he resumed smoking cigarettes and continued to use marijuana, and he was having trouble walking distances without having shortness of breath. (Tr. 1400-01). On examination, Dr. Thurman reported that plaintiff moved stiffly and slowly in the examination room, but he was in no acute distress; had non-labored breathing in room air and bilateral expiratory wheezes followed by a wet-sounding nonproductive cough; and he had no edema and normal muscle bulk. (Tr. 1401). Plaintiff's depression and alcohol misuse screening were both negative. (*Id*.). Plaintiff presented to Dr. Thurman on June 21, 2018 for a runny nose and shortness of breath. (Tr. 1412). On examination, Dr. Thurman reported that plaintiff was well-appearing and in no acute distress; had bilateral turbinate edema and moist mucus membranes; was non-labored on room air; and

had a normal gait. (Tr. 1413).[5] Dr. Thurman assessed plaintiff with acute seasonal allergic rhinitis due to pollen. (*Id.*).

On August 13, 2018, plaintiff presented to the emergency department following a fall in his bathroom. (Tr. 1494). A CT of plaintiff's chest was negative for acute pulmonary embolism. (Tr. 1499). There was no acute abnormality of plaintiff's cervical spine; no acute intracranial abnormality; no acute abnormality in plaintiff's left shoulder and chest; and no evidence of acute fracture or subluxation of plaintiff's thoracic or lumbar spine. (Tr. 1499-1504). Plaintiff was advised to take over-the-counter analgesics for pain relief and was discharged in stable condition on the same day. (Tr. 1504). On December 21, 2018, plaintiff presented to Dr. Thurman for a laceration of his left little finger while he was using a tire changing machine and mechanic tools. (Tr. 1450-51).

### E. Specific Errors

On appeal, plaintiff alleges three issues: that the ALJ erred by (1) relying on the jobs classified by the VE; (2) improperly weighing the FCE completed by physical therapist Sean Smith; and (3) determining that plaintiff was able to sustain a forty-hour work week and could perform "frequent" handling. (Doc. 14). The Commissioner argues in response that all of the ALJ's alleged errors identified by plaintiff "are, at best, harmless" because plaintiff would nevertheless be found not-disabled. (Doc. 19).

### 1. The ALJ did not err by relying on the testimony of the VE.

In his first assignment of error, plaintiff argues that the ALJ erred in relying on the VE's testimony because it was inconsistent with the Dictionary of Occupational Titles ("DOT"), and the VE did not adequately explain the reason for the discrepancies. (Doc. 14 at PAGEID 1588).

---

[5] It does not appear from the record that Dr. Thurman performed a musculoskeletal examination of plaintiff on this date.

The ALJ's RFC limited plaintiff to occasional reaching overhead.  (Tr. 16).  Plaintiff argues that according to the DOT, the jobs identified by the VE and relied on by the ALJ – occupations of router, marker, and label coder – all "require frequent reaching and not occasional as per the decided RFC."  (*Id*. at PAGEID 1589).  Plaintiff argues that the ALJ erred because the stated jobs testified to by the VE "do not fit the decided RFC" and "the VE did not fully explain how these jobs could be performed when the RFC does not match the requirements in the DOT[.]" (*Id*.).  The Commissioner argues that any error by the ALJ was harmless because even assuming plaintiff was limited to "occasional reaching," the VE testified to other work in the national economy that plaintiff could perform.  (Doc. 19 at PAGEID 1613-15).

At the hearing, the ALJ posed questions to the VE concerning a hypothetical person with plaintiff's age, education, and past relevant work, and several differing residual functional capacities.  In response to the first hypothetical question, which included the limitation of frequent reaching overhead, the VE identified the light unskilled jobs of router, marker, and label coder.  (Tr. 60).  The ALJ relied on these jobs in making her Step Five finding that plaintiff is not disabled.   (Tr. 23).  As plaintiff correctly points out, the ALJ's reliance on a hypothetical question that included frequent reaching overhead does not square with the RFC ultimately found by the ALJ, which limited plaintiff to only occasional reaching overhead.  (Tr. 16). Nevertheless, any error by the ALJ in this regard is harmless.

The second hypothetical question posed to the VE mirrored the RFC ultimately determined by the ALJ.  (Tr. 60).  Thus, this hypothetical included the restriction of only occasional overhead reaching.  (*Id*.).  The VE testified that two of the jobs he previously identified (label coder and marker) would be eliminated, but the router job would remain with a reduced number of 20,000 available jobs in the national economy.  (*Id*.).  The VE further

testified that there would be additional light, unskilled jobs the hypothetical individual could perform such as cashier, DOT # 211.462-010 (estimated 100,000 jobs nationally) and inspector/tester/sorter, DOT # 529.685-274 (estimated 20,000 jobs nationally). (*Id*.).

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). For the ALJ to meet her burden, "the Commissioner must make a finding 'supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs.'" *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 238 (6th Cir. 2002) (quoting *Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987)). A VE's testimony on the availability of jobs in the relevant economy may constitute substantial evidence "where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Thomas v. Comm'r of Soc. Sec*., 550 F. App'x 289, 290 (6th Cir. 2014) (quoting *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001)).

In this case, of the three jobs relied upon by the ALJ at Step Five, the router job remained given the RFC actually found by the ALJ. The VE testified there would be 20,000 such jobs in the national economy given this RFC. (Tr. 60). Thus, even if the label coder and marker jobs were eliminated, the number of router jobs that remained in the national economy – 20,000 – exist in a significant number for purposes of the ALJ's burden of proof. *See Taskila v. Comm'r of Soc. Sec*., 819 F.3d 902, 905 (6th Cir. 2016) (200 jobs in the region and 6,000 jobs nationwide amounted to "significant numbers" of available jobs) (citing *Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs in the national economy constituted a significant

17

number).  Moreover, the VE identified other jobs in the national economy that a hypothetical individual with plaintiff's RFC could perform: cashier (estimated 100,000 jobs nationally) and inspector/tester/sorter (estimated 20,000 jobs nationally).  These additional jobs also exist in substantial numbers.  Thus, because the evidence establishes that plaintiff could perform a significant number of jobs given an RFC limiting him to only occasional overhead reaching, any error by the ALJ at Step Five is harmless.

In the alternative, plaintiff's argument is waived because plaintiff failed to raise his challenge to the VE's testimony at the hearing, and the ALJ complied with her obligations under SSR 00-4p by asking the VE whether a conflict existed between his testimony and the DOT and the VE testified that his testimony was consistent with the DOT.

The ALJ has a duty under Social Security Ruling 00-4p to develop the record and ensure there is consistency between the VE's testimony and the DOT.  SSR 00-4p, 2000 WL 1898704. SSR 00-4p specifically provides, in pertinent part:

> Occupational evidence provided by a VE or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  *At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.*

*Id*. at *2 (emphasis added).

Where the ALJ questions the VE and the VE testifies that there is no conflict with the DOT, the Sixth Circuit has repeatedly held that the ALJ is under no further obligation to interrogate the VE, especially where the plaintiff is afforded a full opportunity to cross-examine the VE.  *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).  *See also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013); *Ledford v. Astrue*, 311 F. App'x

746, 757 (6th Cir. 2008). The ALJ is only required to develop the record further where the

conflict between the DOT and the VE's testimony is apparent. *See* SSR 00-4p, 2000 WL

1898704, at *4 ("If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator

will obtain a reasonable explanation for the apparent conflict."). Moreover, "[t]he Sixth Circuit,

along with other courts across the country, have generally recognized that a claimant's failure to

object to testimony offered by a vocational expert, at the time of the administrative proceeding,

waives the claimant's right to raise such issues in the district court." *Harris v. Comm'r of Soc.*

*Sec.*, No. 1:11-cv-1290, 2012 WL 4434078, at *3 (N.D. Ohio Sept. 24, 2012) (finding the

plaintiff's failure to raise objections to the VE's testimony waived the argument on appeal)

(citing *Hammond v. Chater*, No. 96-3755, 1997 WL 338719, at *3 (6th Cir. June 18, 1997). *See*

*also Turner v. Comm'r of Soc. Sec.*, No. 2:19-cv-900, 2019 WL 5781608, at *5 (S.D. Ohio Nov.

5, 2019), *report and recommendation adopted*, 2020 WL 132269 (S.D. Ohio Jan. 13, 2020) (the

plaintiff "failed to raise his challenge to the VE's testimony at the administrative hearing and

therefore waived it" because the ALJ complied with his obligations under SSR 00-4p by asking

the VE whether a conflict existed between his testimony and the DOT and the VE testified that

his testimony was consistent with the DOT); *Lyon v. Comm'r of Soc. Sec.*, No. 1:11-cv-1104,

2013 WL 1149967, at *4 (W.D. Mich. Mar. 19, 2013) (the plaintiff's challenge to the VE's

testimony was waived because the plaintiff failed to object to the testimony at the administrative

hearing).

Here, the ALJ asked the VE if his testimony was consistent with the DOT and the VE

responded that there were no inconsistencies between his testimony and the DOT and he was

relying on his professional experience for several issues, including the overhead reaching. (Tr.

63). After the VE responded, the ALJ turned the questioning over to plaintiff's counsel. (*Id.*).

Plaintiff's counsel, however, did not question the VE about any apparent inconsistencies between his testimony and the DOT, nor did plaintiff's counsel bring any potential conflicts to the ALJ's attention after the hearing.  Counsel was afforded a full opportunity to cross-examine the vocational expert, and the ALJ had no affirmative duty under SSR 00-4p to conduct his own interrogation of the VE to determine the accuracy of the vocational testimony.  *See Lindsley*, 560 F.3d at 606  ("Nothing in S.S.R. 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.") (citing *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006)); *see also Lee*, 529 F. App'x at 715 (the ALJ asked the VE if her testimony was consistent with the DOT, the VE answered that it was, and "[t]his effectively satisfied the Commissioner's burden" particularly because the plaintiff's "representative could have—but did not—cross-examine the VE concerning her representation").  Because the ALJ specifically asked the VE if his testimony was consistent with the DOT and the uncontradicted testimony of the VE indicated that no conflict existed, the ALJ did not commit reversible error at Step Five of the sequential evaluation process.

### 2.  The ALJ did not err in giving little weight to the FCE.

In his second assignment of error, plaintiff argues that the ALJ erred in giving little weight to the FCE completed by physical therapist Mr. Smith.  (Doc. 14 at PAGEID 1589-91). The FCE by Mr. Smith reflected plaintiff had decreased fine manipulation and grip strength and decreased bilateral shoulder range of motion that impacts his ability to reach overhead or sustain work away from his body.  (Tr. 1104).  Plaintiff argues the decreased fine manipulation with slow cadence and tremors would make it impossible to do the frequent finger manipulation set forth in the RFC.  (*Id.*, citing Tr.1104, 1107).  Plaintiff contends that the FCE findings indicated that the

RFC should be occasional handle and finger at best. (*Id*. at PAGEID 1591). Plaintiff also argues

that the "ALJ should have considered the FCE as a treating-source opinion," and that

"[f]ollowing the functional capacity evaluation would make it impossible for [plaintiff] to sustain

any full-time employment." (*Id*. at PAGEID 1590).

To the extent that plaintiff contends the "ALJ should have considered the FCE as a

treating-source opinion" (Doc. 14 at PAGEID 1590), plaintiff's argument is without merit. In

support for the argument that the FCE should have been evaluated under the treating physician

standard, plaintiff cites to *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546 (6th Cir. 2020). (*Id*.).

The Sixth Circuit's decision in *Hargett*, however, is factually distinct from the instant matter.

There, the Court of Appeals determined that the presence of the signature of the plaintiff's

primary care physician on the FCE form, which was completed by a physical therapist, was

sufficient to elevate the FCE to a treating-source opinion. *Id*. The Sixth Circuit explained that

the ALJ should have considered the FCE as a treating source opinion because the plaintiff's

primary care physician referred plaintiff for the FCE and thereafter signed off on the results. *Id*.

at 554.

Although Dr. Mina referred plaintiff for a FCE (*see* Tr. 592, 1104), there is no indication,

and plaintiff has not presented evidence in the record, that any of plaintiff's "treating"

physicians' signatures, including Dr. Mina's signature, appear on the FCE form. (*See* Tr. 1104-

09). Therefore, the Sixth Circuit's decision in *Hargett* is inapplicable to the facts of this case,

and the ALJ did not err by failing to consider the FCE as a treating source opinion.

Rather, it is well-established that under the regulations and rulings applicable to

plaintiff's claim, only "acceptable medical sources" as defined under former 20 C.F.R. §

404.1513(a) can provide evidence which establishes the existence of a medically determinable

impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight.  *See* SSR 06-03p, 2006 WL 2329939, *2.[6]

A physical therapist, like Mr. Smith, is not an "acceptable medical source" as defined under the applicable Social Security rules and regulations but instead falls under the category of "other source."  *Compare* former 20 C.F.R. § 404.1513(a) (listing "acceptable medical sources") with former 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 404.1513(a), such as physicians' assistants, chiropractors, and therapists, are considered to be "other sources" rather than "acceptable medical sources").  *See also Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source).  Because physical therapists are not considered acceptable medical sources under the regulations, the ALJ was not required to give "good reasons" under the treating physician rule or any special deference to Mr. Smith's findings, reports, or opinions contained in the FCE.

Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2; former 20 C.F.R. § 404.1513(d).  Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's

---

[6] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date.  82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).  Because plaintiff's claim was filed on January 3, 2017 (*See* Tr. 12), before the effective date of the rescission, SSR 06-3p applies here.

impairment. SSR 06-03p, 2006 WL 2329939, at *4. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6.

Because Mr. Smith is not an acceptable medical source, the ALJ was not bound to weigh his opinion in accordance with the regulatory factors. The ALJ, however, complied with the regulations by considering Mr. Smith's opinion and discounting it for valid reasons which are substantially supported by the evidence. Specifically, the ALJ reasonably concluded that Mr. Smith's opinion that plaintiff was "unlikely to sustain part time or full time employment" (Tr. 1104) amounts to an issue reserved to the Commissioner based on Social Security rules and regulations. (Tr. 20-21). Whether a person is disabled within the meaning of the Social Security Act, i.e., unable to engage in substantial gainful activity, is an issue reserved to the Commissioner, and a medical source's opinion that his patient is "disabled" or "unable to work" is not "giv[en] any special significance." 20 C.F.R. § 404.1527(d)(3). *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (opinion by medical source on issues reserved to Commissioner is never entitled to controlling weight or special significance); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Therefore, Mr. Smith's opinion that plaintiff would be unable to sustain employment is not entitled to any weight.

Moreover, the ALJ reasonably concluded that Mr. Smith's opinion was inconsistent with examinations performed several months prior. (Tr. 21) (citing Tr. 1258-59). The ALJ explained that Mr. Smith's opinions were inconsistent with testing completed "just a few months prior to

Mr. Smith's assessment" that showed that plaintiff "had strength at four out of five in neck flexion, extension, bilateral deltoid, bilateral biceps, triceps, wrist flexion, interossei, abdominals, iliopsoas, quadriceps, hamstring, glutei, anterior and posterior tibial, peroneal and gastric," and plaintiff's "bilateral upper and lower extremities [were] normal to touch and his muscle strength was rated at four out of five in the bilateral quadriceps and bilateral hamstrings." (*Id.*) (citing Tr. 1258-59). The ALJ committed no error in evaluating Mr. Smith's opinion and giving it little weight. The ALJ was not required to give any special deference to the opinion of Mr. Smith, a physical therapist who only evaluated plaintiff on a single occasion. Plaintiff's second assignment of error is therefore overruled.

Finally, to the extent that plaintiff claims that "the RFC should be occasional handle and finger at best" (Doc. 14 at PAGEID 1591), plaintiff fails to explain how this additional restriction would change any of the ALJ's findings or conclusions. Even accepting plaintiff's argument that he should be limited to occasional handling and fingering would still result in a finding of non-disability because the VE identified a significant number of representative occupations that exist in the national economy which include this exact limitation and restriction. *See Mabrey v. Comm'r of Soc. Sec.*, No. 1:13-cv-555, 2015 WL 556435, at *5 (S.D. Ohio Feb. 10, 2015), *report and recommendation adopted*, 2015 WL 1412205 (S.D. Ohio Mar. 26, 2015); *Miller v. Comm'r of Soc. Sec.*, No. 1:11-cv-2131, 2013 WL 1283871, at *3 (N.D. Ohio Mar. 26, 2013) (affirming the ALJ's finding of non-disability where the response of the VE under a hypothetical, in which the ALJ did not incorporate into his decision, was sufficient to carry the ALJ's Step Five burden). Specifically, the VE testified that occupations such as rental clerk, page, usher, callout operator, and surveillance monitor would all exist in response to the following hypothetical by the ALJ: "And then for hypothetical five, if we took any of the prior

24

hypotheticals [*see* Tr. 59-61] but reduced the individual to occasional handling and fingering with the bilateral upper extremities, would that change any of your prior responses?" (Tr. 61-62). According to the DOT, the jobs identified by the VE in response to the ALJ's fifth hypothetical (Tr. 61-62) require "occasional[]" "reaching," "handling," and "fingering." *See* DOT # 295.357-018, 1991 WL 672589 (rental clerk) (estimated 20,000 jobs nationally); DOT # 353.367-022, 1991 WL 672928 (page) (estimated 6,000 jobs nationally); DOT # 344.677-014, 1991 WL 672865 (usher) (estimated 5,000 jobs nationally); and DOT # 237.367-014, 1991 WL 672186 (call-out operator) (estimated 5,000 jobs nationally). The position of surveillance-system monitor (estimated 6,000 jobs nationally) (Tr. 62) requires no reaching, handling, or fingering. *See* DOT # 379.367-010, 1991 WL 673244 (surveillance-system monitor). Accordingly, the record demonstrates that even considering plaintiff's argument that "the RFC should be occasional handle and finger at best" (Doc. 14 at PAGEID 1591), the ALJ committed harmless error at best because the existence of 42,000 jobs (combining the above positions) is a significant number of jobs that exist in the national economy that plaintiff could nevertheless perform. *See Taskila*, 819 F.3d at 905 (citing *Nejat*, 359 F. App'x at 579); *Nash*, 1995 WL 363381, at *3; *Putman*, 2009 WL 838155, at *2-3.

### 3. The ALJ did not err in concluding that plaintiff could frequently handle or finger

Similar to plaintiff's argument presented in his second assignment of error, plaintiff argues in his third assignment of error that the ALJ erred "by finding [plaintiff] could perform 'frequent' handling." (*Id.*). Plaintiff contends that at best, he can only handle and finger occasionally. (*Id.*). For the reasons explained above, this assignment of error is without merit because even accepting plaintiff's argument that he should be limited to occasional handling and fingering, the ALJ's finding would constitute harmless error because the VE identified a

significant number of representative occupations that exist in the national economy that include this exact limitation and restriction. (Tr. 61-62).

Even so, the ALJ's RFC finding that plaintiff could "frequently" handle is supported by substantial evidence. A claimant's RFC is an assessment of the most that a claimant "can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The Social Security regulations vest the ALJ with the responsibility of assessing an individual's RFC. *See* 20 C.F.R. § 404.1546(c) (the responsibility for assessing a claimant's RFC at the administrative hearing level lies with the ALJ). The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3). This includes weighing the relevant medical opinions of record. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).

Here, the ALJ's RFC finding, in pertinent part, provides that plaintiff "can only occasionally operate hand controls with the bilateral upper extremities; only occasionally reach overhead with the bilateral upper extremities; [and] he can frequently handle and finger with the bilateral upper extremities[.]" (Tr. 16). Plaintiff cites to the FCE completed by Mr. Smith and his own testimony in support of his argument that the ALJ erred in finding that he could "frequently" handle. (Doc. 14 at PAGEID 1592-93).

For the reasons stated above, the ALJ did not err by not incorporating the opinion of Mr. Smith into plaintiff's RFC. Plaintiff also argues that his own testimony established that he could not frequently handle or finger. (*Id.*). Plaintiff points to the following testimony in support of his argument that the ALJ erred by concluding that he could "frequently" handle:

> Mr. R[ie]chman testified that he has problems using his arthritic hands due to pain and stiffness (Tr. 41). Mr. Riechman reported he was unable to move his head side to side and reach overhead due to torn rotators (Tr. 45). Mr. Riechman further

testified inability to play guitar, repair cars, shave, hold objects, and dress due to loss of hand grip strength (Tr. 46-48 & 50).

(*Id*. at PAGEID 1593).[7]  In her decision, the ALJ acknowledged plaintiff's testimony but found that plaintiff's allegations of the intensity, persistence, and limiting effects of plaintiff's symptoms were not entirely consistent with the medical evidence of record.  (Tr. 17).  Plaintiff has not challenged, or assigned any error to, the ALJ's assessment of plaintiff's subjective statements of pain and limitations, which is therefore entitled to deference here.  *See Torres v. Comm'r of Soc. Sec*., No. 11-3981, 2012 WL 3089334, at *6 (6th Cir. July 31, 2012) (credibility determinations regarding the claimant's subjective complaints of pain rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence).  Accordingly, the ALJ was not required to incorporate a limitation into the RFC finding based on plaintiff's testimony at the ALJ hearing.

Plaintiff also cites to select treatment notes and records in support for his argument that the ALJ erred by finding plaintiff could "frequently" handle.  Plaintiff specifically argues that his neck and shoulder pain "would further limit handling (Tr. 425, 431, 1104, 1122, 1336 & 1492)." (Doc. 14 at PAGEID 1592).  Plaintiff, however, provides no further analysis or discussion.  Tr. 425 is a treatment note from Dr. DeLorenzo from September 9, 2016 which states that plaintiff "overall [has] had a marked reduction of his joint swelling especially in the hands and feet.  He still has a fair amount of stiffness especially in the morning.  He continues to have stiffness and discomfort in the upper cervical spine as well."  (Tr. 425).  Contrary to plaintiff's assertion, nothing in this treatment notes provides support for his claim that his neck and shoulder "would

---

[7] The Court notes that despite plaintiff's testimony that he was unable to work on cars (Tr. 50), the record reflects at least one occasion that plaintiff was presumably working on cars because plaintiff presented to Dr. Thurman on December 21, 2018 for a laceration of his left little finger while he was using a tire changing machine and mechanic tools.  (Tr. 1450-51).

further limit handling." (Doc. 14 at PAGEID 1592). Rather, the cited treatment note indicates that plaintiff was improving and had a reduction in the swelling in his hands and feet. (Tr. 425). Plaintiff likewise cites to Tr. 431, which is a physical examination of plaintiff conducted on May 23, 2016 by Dr. DeLorenzo. (Tr. 431). The examination, in pertinent part, provides that plaintiff had a loss of several degrees of full extension in his elbows, but no synovitis of his elbows, wrist, MCP's, PIP's, or DIP's, and he had no synovitis of his knees or ankles, but had some tenderness over his left SI area. (*Id*.). Plaintiff fails to explain how this single physical examination by Dr. DeLorenzo would invalidate, or cast doubt on, the ALJ's RFC finding that plaintiff could frequently handle. This is especially true given plaintiff's notable improvement on the following physical examination. Specifically, on September 9, 2016, Dr. DeLorenzo reported that plaintiff had full range of motion of his shoulders and elbows; he had some stiffness of the wrist MCPs and PIPs, but markedly reduced synovitis; and he had no synovitis in his knees or ankles and was only minimally tender in his feet with markedly reduced swelling of his feet. (Tr. 426). Dr. DeLorenzo stated that plaintiff showed "some definite improvement." (*Id*.). Plaintiff next cites to Tr. 1104, which is the FCE completed by Mr. Smith on January 8, 2018. (Tr. 1104). For the reasons stated above, however, the ALJ did not err by not incorporating the opinion of Mr. Smith into plaintiff's RFC.

Plaintiff also cites to Tr. 1122, which is the final page in a physical functional capacity questionnaire completed by Dr. Thurman on January 30, 2018. (Tr. 1122). Dr. Thurman opined in the questionnaire that plaintiff had significant limitations with reaching, handling, and fingering and would be absent more than four days of work per month. (*Id*.). However, plaintiff has waived any argument pertaining to the ALJ's weighing of the opinion of Dr. Thurman by failing to develop it either legally or factually in his Statement of Errors. Specifically, in a single

sentence buried within his third assignment of error, plaintiff states, "To the extent that the ALJ

ignored Dr. Zachary Thurman's RFC (Tr. 1118-1122) and Sean Smith, PT's FCE (Tr. 1104-

1109) opinions, she erred."  (Doc. 14 at PAGEID 1592).  "It is not sufficient for a party to

mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its

bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  *See also Rice v. Comm'r of

Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (a plaintiff's failure to develop an argument

challenging an ALJ's non-disability determination amounts to a waiver of that argument).

Plaintiff failed to develop this argument legally or factually, provide any analysis, or cite any

specific reasons as to why he believes the ALJ committed error.  Therefore, any such argument is

waived.  *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) (internal citations

omitted) (emphasis added) (The Sixth Circuit "has consistently held that arguments not raised in

a party's opening brief, *as well as arguments adverted to in only a perfunctory manner*, are

waived").

Finally, plaintiff cites to a February 23, 2018 x-ray of his shoulder (Tr. 1336) and a CT of

his cervical spine and head (Tr. 1492) as evidence that plaintiff had "suffered from neck and

shoulder pain that would further limit handling[.]"  (Doc. 14 at PAGEID 1592).  The ALJ,

however, discussed the results of this imaging in her decision.  (*See* Tr. 18-19).  Plaintiff fails to

allege how the ALJ erred in this regard.

Plaintiff does not explain how the ALJ's limitation of "frequent" handling is not

supported by substantial evidence.  Plaintiff has not shown that the ALJ erred by failing to fully

account for his alleged impairments and resulting limitations in the RFC finding.  Accordingly,

the ALJ's RFC is supported by substantial evidence, and plaintiff's assignment of error regarding

the ALJ's RFC assessment is overruled.

Plaintiff also argues that "the ALJ decision should be reversed" because "[b]ased upon SSR ruling 96-9p, [plaintiff] would not be employable on a sustained 40-hour work-week basis." (Doc. 14 at PAGEID 1593).  Plaintiff's reliance on SSR 96-9p, however, is misplaced.  The purpose of SSR 96-9p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment *for less than a full range of sedentary work* on an individual's ability to do other work."  SSR 96-9p, 1996 WL 374185   (emphasis added).  Essentially, this regulation provides guidelines to ALJs for evaluating a claimant's ability to do less than a full range of sedentary work.  However, SSR 96-9p is not relevant to plaintiff's claim because it addresses the ALJ's evaluation of an individual limited to sedentary work, rather than to an individual capable of performing light work.  *See Abraham v. Comm'r of Soc. Sec.*, No. 1:08cv117, 2008 WL 4738333, at *3 (W.D. Mich. Oct. 24, 2008) (citing SSR 96-9p, 1996 WL 374185).  Here, the ALJ found that plaintiff could perform a range of light work. (Tr. 23).  Thus, plaintiff's third assignment of error is also overruled on this basis.

## IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner is **AFFIRMED** and this case is closed on the docket of the Court.

Date: 8/29/2021

Karen L. Litkovitz
Chief United States Magistrate Judge